**WILLIAMSON LEASING CO., INC.; Donald W. Pemberton; R. L. Kirkpatrick; and Donald W. Pemberton and Raymond V. Kimble, Jr., as Co-Executors of the Estate of Bilbo E. Williamson, Deceased, Plaintiffs-Appellants,**

v.

**Floyd W. KEPHART, Jr., and Capital Development Corporation, Defendants-Appellees.**

Court of Appeals of Tennessee,
Middle Section.

Nov. 20, 1981.

Application for Permission to Appeal Denied by Supreme Court Feb. 8, 1982.

**684**

Harris A. Gilbert and Ralph Z. Levy, Jr., Barksdale, Whalley, Gilbert, Frank, Ludwick & Milom, Nashville, for plaintiffs-appellants.

Thomas Wardlaw Steele, Nashville, for defendants-appellees.

## OPINION

LEWIS, Judge.

Plaintiffs Williamson Leasing Company, Inc., Donald W. Pemberton, R. L. Kirkpatrick, and Donald W. Pemberton and Raymond V. Kimble as Co-Executors of the Estate of Bilbo E. Williamson, deceased, sued defendant Capital Development Corporation (Capital) and Floyd W. Kephart, Jr. on a promissory note and sought a judgment of $250,000 plus interest and attorneys fees. Defendant Kephart counterclaimed against plaintiffs Donald W. Pemberton individually, R. L. Kirkpatrick, and Donald W. Pemberton and Raymond V. Kimble as Co-Executors of the Estate of Bilbo E. Williamson, deceased, as co-makers of the note along with Kephart and alleged that he (Kephart) was entitled to contribution, exoneration, or indemnification from each of the other co-makers in the event he was required to satisfy the note sued on.

The Chancellor, after a bench trial, dismissed both the complaint and the counter-complaint, and plaintiffs have appealed.

The facts are as follows: Defendant Kephart was President and sole owner of Capital. LaFollette Mining Company (LaFollette) was a wholly owned subsidiary of Capital. During 1977, defendant Kephart's primary occupation was in the coal business.

LaFollette had a contract with the Tennessee Valley Authority to supply TVA with coal. Neither Capital nor its subsidiary LaFollette had sufficient capital to conduct the mining of coal sufficient to comply with the TVA contract. It was, therefore, necessary for Capital to raise some $250,000. This $250,000 would provide interim financing until such time as Capital could sell fifty percent of LaFollette to D. C. Transient Systems, Incorporated.

In 1977, plaintiff Kirkpatrick had discussions with defendant Kephart regarding investments in defendant Kephart's coal mining interests. On December 1, 1977, defendant Kephart wrote plaintiff Pemberton the following letter:

December 1, 1977

HAND DELIVERY

Don Pemberton, Esquire
1st Commerce Plaza
Memphis, Tennessee
Dear Don,

Pursuant to our conversation, the following is a synopsis of the proposition between Capital Development Corporation and your group in LaFollette Mining Company.

Capital Development owns 100% of the stock in LaFollette Mining Company. LaFollette Mining has a five year contract with TVA to provide 248,000 tons of coal per year, at a price of $31.30 per ton. Capital Development has agreed to sell 50% of LaFollette Mining Company to a third party for $650,000.00, payable at time of closing, and closing is scheduled within the next sixty days.

Capital Development and your group will form a joint venture to provide the initial financing of the TVA contract to LaFollette Mining. This amount is $250,000.00. Capital Development will borrow, in their name, said amount from the

Metropolitan Bank in Tampa, Florida. You, Williamson, Kirkpatrick and I will individually guarantee the loan. The loan will be ninety days with an option to renew for an additional ninety days. Capital Development will re-pay the loan from the sale of the 50% of LaFollette Mining.

LaFollette Mining will contract with the joint venture to pay an amount equal to 4.5% of the gross amount of the sales price of the coal under the TVA contract on a monthly basis for providing the financing. The agreement will run for the term of the contract which is five years.

Capital Development will agree to handle all of the details and provide the joint venture with monthly production reports and payments.

It will be required that you, Bilbo, Kirkpatrick and I sign the papers in Tampa on Tuesday, December 6, 1977. I will have our attorney prepare the joint venture documents and the agreement with LaFollette Mining. They should be ready no later than Wednesday. All of the closing documents where we acquired the LaFollette property, and the executed TVA contract and all of the other agreements, are in our office and are available for your review at any time.

Thank you for cooperating with us in this matter, and we look forward to working together in the future.

Warmest personal regards,
/s/ Floyd
Floyd W. Kephart, Jr.

In response to the foregoing letter, plaintiff Pemberton wrote the following letter to defendant Kephart.

December 5, 1977

Mr. Floyd Kephart, Jr., President
Capital Development Corporation
Suite 202
4515 Harding Road
Nashville, Tennessee 37205

Re: *LaFollette Mining Company*

Dear Floyd:

I am in receipt of your letter of December 1, 1977, concerning your proposal to me, Bilbo Williamson and Ron Kirkpatrick.

We are agreeable to endorsing a note for a loan to your company from Metropolitan Bank, Tampa, Florida, in the amount of $250,000 with the following provisos:

1. You along with the three of us will personally guarantee such loan.

2. The loan will be a 90-day loan with an option to renew for an additional 90 days.

3. You or your company agree to repay this indebtedness by its due date from the sale of a 50% interest in LaFollette Mining Company, it being our understanding that the closing of this sale will take place in the immediate future.

4. LaFollette Mining will pay to me, Mr. Williamson and Mr. Kirkpatrick an amount equal to 4½% [interlined preceeding the 4½% in ink is written "one-half of the" and is initialed "DWP" and "FWK"] of the gross amount of the sales price of all coal under the TVA contract on a monthly basis for a period of 5 years.

5. In the event the loan is not paid off within 6 months, Mr. Williamson, Mr. Kirkpatrick and I shall be entitled to receive 25% interest in LaFollette Mining Company in addition to the override of 4½% on the TVA contract.

6. All of the above will be reduced to more formal documentation to evidence our agreement as contained in your letter of December 1, 1977, and in this letter.

If you agree with the above, I would appreciate your executing a copy of this letter.

Kindest personal regards.

Cordially yours,
/s/ Donald W. Pemberton
Donald W. Pemberton

DWP;ef
Encl.

ACCEPTED THIS 6th DAY OF DECEMBER, 1977.

/s/ Floyd W. Kephart, Jr.
Floyd Kephart, Jr.

On December 6, 1977, the individual plaintiffs and defendant Kephart flew to Tampa, Florida, to borrow the $250,000 from the Metropolitan Bank of Tampa, Florida (Bank). There is evidence that defendant Kephart signed and accepted the December 5th letter on the flight to Tampa and that the parties initialed a change which halved plaintiffs' TVA "over-ride" at the same time.

The note was signed by Capital by its President, Floyd W. Kephart, Jr. and by Kephart, Pemberton, Kirkpatrick, and Bilbo E. Williamson individually. Capital received the $250,000 proceeds of the note and commenced its mining operations which were a failure from the beginning.

Plaintiff Pemberton admitted that Kephart informed him prior to the execution of the $250,000 note that he, Kephart, did not have sufficient financial strength to borrow the $250,000 and that it was the financial strength of Pemberton, Kirkpatrick, and Williamson that was necessary in order to induce the Bank to make the loan. Pemberton also stated, on cross-examination, that in the letters exchanged between him and Kephart there was no mention of any means of paying off the note except through the sale of the fifty percent interest in LaFollette.

Kephart testified that in addition to the $250,000 borrowed from the Bank, he and Capital invested an additional $480,000 in LaFollette.

Neither plaintiffs nor defendants ever received any of the 4.5 percent "over-ride" which was to be paid jointly to plaintiffs and defendant on the sale of coal to TVA.

In June, 1978, the $250,000 note matured and plaintiffs requested and received a thirty-day extension from the Bank. Pemberton then wrote Kephart on July 6, 1978, a part of which is as follows:

I have now tried since Monday, June 26th, to reach you by telephone and you obviously choose not to return my calls. I have told Jerry on at least two occasions that I was looking for you, your secretaries on many more, and find it incomprehensible that you did not receive one of those messages that I was urgently looking for you.

The last time you and I discussed the coal mine, you indicated to me first that you would pay the interest which, in fact, you never did until two or three days ago, and also indicated to me that you would make a special trip to Tampa to meet with Don Reagor to discuss the matter with him. On the assumption that you did both of those things, I did nothing further with the bank, even though they had called upon me for either payment of the note or adequate collateral.

Because I realized that we were equally liable on the note with you, I felt it incumbent upon me to keep the lines of communication open with the bank and to accommodate them in any manner possible. To that end, I agreed that if you did not make satisfactory arrangements with the bank that we would, of course see to it that the loan was collateralized.

Further:

For your information, we have purchased at face value the note and intend to proceed against you on the note unless the S–1 Registration is realistic. To that end, I should appreciate receiving from you the name of the person at Lehman Bros. in New York who is handling this matter, in order that I might communicate with him and confirm what you have told me.

On July 31, Kephart answered Pemberton's letter as follows:

I am sorry you have had such a difficult time contacting me, however, in the reference dates in your letter, I returned you [sic] calls, was advised you were out, left work and ultimately talked to Kirkpatrick.

I am sorry most of all that you have had difficulty with the LaFollete project. It is a problem with which I have hassled long and hard and of which I hope to have resolution shortly. I am enclosing for your information and your documentation all of the specific information

which you requested with one exception; that is with respect to the S–1 registration. Mr. David Fisher of the law firm of Bandler & Kass, 605 Third Avenue, New York (212–972–1100) has advised me that in their judgment we are better off to place the offering into a 146 registration due to the time involved with the SEC. I have been advised during the past week that they do not feel they can complete an S–1 registration prior to the end of the year. They are therefore proceeding on a 146 offering which Bandler & Kass are currently preparing. Anytime after the election is over after Thursday, I will be delighted to go with you to New York to sit down with the lawyers, along with those people selling the units, go over all the documents, and let you talk with them about their time schedule on the project. The seller on the units, according to my understanding, is to be Mr. Steve Weil, whom you may contact at 305–741–9100. He has assured me that there is no problem with selling the product.

Don, I cannot adequately explain to you the problems we have had with La-Follette or the consumption of time which those problems have taken. It is my sole purpose to resolve LaFollette in such a way that the $250,000 note is paid, and that I end up without that liability, and certainly where neither you nor your client has any liability.

While I will certainly be tied up the rest of this week and have a meeting before the SEC on Monday, I will be delighted to meet with you at your convenience and go over any of the intricacies of the deal. I am sorry I have been diverted by the election and have not gotten this syndication consumated [*sic*], but it has been a matter beyond my control.

I look forward to hearing from you soon, and please feel free to contact me if you should need anything further.

Warmest personal regards,
/s/ Floyd W. Kephart, Jr.
Floyd W. Kephart, Jr.
FWK/ca

Encs.

P.S. We do not as of this time have all the figures together, however, our accountants at Touche-Ross are getting these for us and I will forward them to you as soon as possible.

On or about July 12, 1978, plaintiff Williamson Leasing Company, Inc., a corporation wholly owned by Bilbo E. Williamson, deceased, purchased the note from the Bank for the principal sum of $250,000. Plaintiffs then brought this suit against Capital and Kephart. The individual plaintiffs sued Capital and Kephart seeking exoneration and, pursuant to T.C.A. § 29–6–103, sought an attachment of the property of both Capital and Kephart. However, the Chancellor refused to issue such attachment.

This case was set for trial on December 8, 1980. On Friday, December 5, 1980, at 3:00 o'clock P. M., plaintiffs filed a motion seeking to amend their complaint. On the morning of trial, defendants filed (1) a motion for continuance insisting that plaintiffs' amendment put forth a new theory and (2) a motion that Kephart be allowed to file a counterclaim against the individual plaintiffs since he was a co-maker, or co-endorser, or a co-guarantor and that, as such, he was entitled to contribution, exoneration, or indemnification from each of the individual plaintiffs.

After hearing argument on the motions, the Chancellor stated that he would grant each of the motions, that plaintiffs would be allowed to amend, and that defendants, as a result, were entitled to a continuance. He also granted Kephart's motion to be allowed to file a countercomplaint against the individual plaintiffs.

To avoid continuing the case, plaintiffs' counsel requested a recess so he might discuss the matter with his clients and defense counsel. After recess, counsel for the parties informed the Court that an agreement had been reached whereby the case could proceed without a continuance. The following colloquy was had between counsel and the Court:

THE COURT: —I think you're going to file this.

MR. STEELE: Yes, sir. It's a consent order.

THE COURT: All right.

MR. STEELE: And the first thing is that their complaint be amended so as to allege that the Williamson Leasing was suing as a holder of the note which Your Honor has already granted an amendment.

And, then, the second item, we agreed to delete from this consent order. So, I'll treat the third one as the second one. And that is that any and all defenses asserted by the defendants in the trial of this action, if sustained by the Court, are good and valid defenses against the plaintiff, Williamson Leasing Company, suing in its capacity as a holder of said promissory note.

In other words, our defenses are good against the leasing company as the holder of the note if they're good against—in the trial at all.

And, then, number four, that Defendant Floyd W. Kephart, Jr., shall be deemed that following this action and counter-claim against the plaintiffs, Donald W. Pemberton, individually, R. L. Kirkpatrick, and Donald W. Pemberton, and—These are the individuals, Donald W. Pemberton, individually, R. L. Kirkpatrick, both of whom are individual plaintiffs in the case. And, then, Donald W. Pemberton and Raymond V. Kimble, Jr., as co-executors of the estate of Bilbo E. Williamson, deceased, claiming that in the event the Court renders a judgment for any amount against him on the promissory note made exhibit A to the complaint, he is entitled to a judgment over against each of such plaintiffs for their pro rata share of the amount intended which he is required to pay in satisfaction of such judgment. This is the counter-claim for contribution and indemnification of co-makers or co-insurors.

THE COURT: I understand.

MR. STEELE: And, then, number five, the defenses asserted by each of the individual plaintiffs who are made counter-defendants hereby to the claim asserted to the counter-plaintiff, Floyd W. Kephart, are as follows: Do you mind me just reading this?

MR. GILBERT: No.

MR. STEELE: As Mr. Gilbert's written it in, that Kephart has no right to a counter-claim—

MR. GILBERT: Better read it again.

MR. STEELE: Yeah. Or contribution from the counter-defendants until he has paid more than his share of the debt, interest, and attorneys' fees for which he may be held liable under the note.

And, then, it goes ahead to adjudge that they are made counter-defendants to this counter-claim. But we're prepared to enter that consent order in the proceeding.

THE COURT: All right. Fine.

MR. GILBERT: Really, what we've done is, as Judge Steele has read to you, is we're agreeable that he, in order to keep this case from being continued, we're agreeable that any defenses that he had against the defendants—against the plaintiffs, originally, he may assert against Williamson Leasing Company, holder of the note, who purchased the note.

And he's held liable even though he has filed a counter-claim against the other sureties on the note. We take the position that we're not liable for him because he has no right to a counter-claim or contribution until he's paid more than his share of the debt, interest, and attorneys' fees, for which he may be held liable on the note.

MR. STEELE: I think I should amplify that a little bit to Your Honor. The counter-claim does seek adjudication by Your Honor in the trial of this action that while he may not have a right to collect anything from the other partners until he's paid his pro-rata share of the note, but adjudication that as co-makers, of course, and accommodation makers of this note that he has a right against them for their pro-rata share to the extent that

he made payments. And we're seeking that as part of the agreed order.

THE COURT: I understand. Are we ready to start the proceedings, now?

MR. GILBERT: Yes, sir. We're ready to proceed, Your Honor.

THE COURT: All right. You may call your first witness.

MR. GILBERT: There's one other thing that's not in this order that we have agreed to. And that is, since he's introduced this ultimate counter-claim and we'd state their defenses to it, and neither side has really adequately briefed the issue, we may need to file a post-trial brief on that point.

We have searched for the consent order referred to above but are unable to locate it in the record before us. However, the case was tried as if a consent order embodying the foregoing had been entered.

After a bench trial, the Chancellor requested post-trial briefs and, thereafter, filed his Memorandum Opinion, which is, in part, as follows:

The plaintiffs argue that Capital Development Corporation and Kephart, as primary obligors, are liable to the accommodation makers. However, item number 5 in the December 5th letter from Pemberton to Kephart states:

In the event the loan is not paid off within six months, Mr. Williamson, Mr. Kirkpatrick and [Mr. Pemberton will] be entitled to receive a 25% interest in LaFollette Mining Company in addition to the over-ride of 4½% on the TVA contract.

The contract should be construed as against its author. *Nashville Electric Supply Co. v. Kay Industries*, 533 S.W. 2d 306 (Tenn.App.1975). If Pemberton, the author, would not agree to receive the stock in the event the note were not paid off, he could have said as much in that letter.

This Court therefore holds that the contract speaks of the parties' rights upon breach; the right to receive 25% of the stock in LaFollette Mining Company. Therefore the complaint and counter-claim are dismissed. The attorney for the defendants will prepare the order and costs will be taxed to the plaintiffs.

Plaintiffs present two issues as follows: (1) Did the Chancellor err in finding that paragraph 5 of the December 5, 1977 letter exonerated both Capital and Kephart? (2) Did the Chancellor err in failing "to find Capital liable for the full amount of the $250,000 note plus interest and attorney's fees, and in not finding Kephart liable as accommodation endorser for his prorata share of such debt?" We discuss these together.

It is the insistence of defendants that they and plaintiffs "formed a joint venture to share the risk of what was contemplated to have been a profitable mining operation." They further insist that the Chancellor was correct in his holding that plaintiffs' sole remedy in the event the loan was not paid by Capital from the contemplated sale of fifty percent of LaFollette was to receive a twenty five percent interest in LaFollette.

█ This Court is of the opinion that, while it is not a paramount issue in this case, the parties did not enter into a joint adventure.

While Kephart, in his letter to Pemberton of December 1, 1977, did suggest a "joint venture," Pemberton's letter of December 5, 1977, accepted by Kephart on December 6, 1977, made no mention of a joint adventure.

Mr. Justice Burnett, writing for the Court in *Spencer Kellogg & Sons, Inc. v. Lobban*, 204 Tenn. 79, 315 S.W.2d 514 (1958), stated:

A very reasonable definition of this creature of the law [joint adventure] is set forth in 30 Am.Jur., p. 939, Sec. 2, as follows:

"A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal

or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure."

Many courts over the country have in the past years defined this term of a joint venture. It signifies to the judicial mind (a joint venture is a creation of the American Courts) that it is something more or less temporary—something gone into to more or less take a gamble on this proposition or that, or as they say sometimes, "take a flier".

*Id.* at 92–93, 315 S.W.2d at 520.

"The elements that need to be shown to establish a joint venture among several parties are a common purpose, some manner of agreement among them, and an equal right on the part of each to control both the venture as a whole and any relevant instrumentality." *Cecil v. Hardin*, 575 S.W.2d 268, 271 (Tenn.1978).

Nothing in this record reveals that either Pemberton, Kirkpatrick, or Williamson had any right to control the means employed to carry out the common purpose, i.e., the mining and selling of coal by LaFollette. Pemberton, Kirkpatrick, and Williamson, in exchange for becoming accommodation makers of the $250,000 promissory note, were to receive 2.25 percent override on the TVA contract. This was all they could receive. They had no voice, either large or small, in the operation of LaFollette.

■ We are also of the opinion that defendants' insistence that plaintiffs, pursuant to paragraph 5 of the December 5 letter, gave up any rights they had as accommodation makers and substituted as their sole remedy an entitlement to "receive a 25% interest in LaFollette Mining Company" and a 2.25 percent "override" if the loan was "not paid off within 6 months" is without merit.

While ordinarily it would not be true, Williamson Leasing Company has agreed as holder of the note that any defense Capital or Kephart has against the individual plaintiffs are good against it. In other words, if Capital or Kephart has a defense against the individual plaintiffs as co-makers, that defense would also be valid as to Williamson Leasing Company. The parties, by agreement for the purpose of the trial of this lawsuit, have cast Williamson Leasing Company in the role of a co-maker of the note.

An accommodation maker, once he has paid the note, has a right of recourse against the party accommodated. T.C.A. § 47–3–415(5). Plaintiffs were sureties or accommodation makers and, as such, if and when one or more of them paid the debt of Capital, he was entitled to be substituted to all of the rights of the Bank, unless he agreed to forego this right.

This Court is of the opinion that plaintiffs did not forego this right. Paragraph 5 of the December 5, 1977 letter states that plaintiffs "shall be entitled to receive a 25% interest." Entitle is defined as: "To give a right to do or have something; allow; qualify. To give a legal right or claim to something." *New College Edition, The American Heritage Dictionary*, p. 437 (1976).

> To "entitle to" is to give a right to; to qualify for; "to furnish with proper grounds for seeking or claiming." Websters New International. When the surety pays, he acquires "grounds for seeking or claiming" substitution to the rights of the creditor whose debt he discharges. While it is not essential for the surety to show that he manifested at the time an intention to exercise this optional right to subrogation, he must proceed within a reasonable time thereafter, and before the rights of third parties intervene, particularly an innocent purchaser, or mortgage encumbrancer for cash loaned, such as the appellee here is shown to be.

*Fitts v. Terminal Warehouse Corp.*, 170 Tenn. 198, 205, 93 S.W.2d 1265, 1267 (1936).

Plaintiffs had a right of subrogation under the law. Paragraph 5 of the December 5, 1977 letter gave them the optional right to take a twenty five percent interest in LaFollette. This was an additional right. We find nothing in either the December 1 letter from Kephart to Pemberton or in Pemberton's December 5 letter to Kephart, or in the record as a whole, which substitutes plaintiffs' entitlement to subrogation as co-makers for a twenty five percent interest in LaFollette. Nothing in the record suggests that paragraph 5 should be read that plaintiffs "shall be entitled to receive [only] a 25% interest." Plaintiffs had the option of exercising their right of subrogation or their additional right under paragraph 5. While plaintiffs did not have to exercise their right of subrogation or their additional right under paragraph 5, they could choose between them or abandon both.

 However even if we were to find that it was the intention of plaintiffs to cover Capital with an umbrella of nonliability in the event the note was not paid within six months, and this Court specifically does not so find, the umbrella would not cover Kephart. His obligation as a co-maker would in no event be extinguished by the December 5 letter.

Kephart, in his letter of December 1 to Pemberton, did not suggest that he be relieved of personal liability on the note. To the contrary, he suggests Capital will borrow $250,000 from the Bank and "you, Williamson, Kirkpatrick and I will individually guarantee the loan." Pemberton, in the December 5 letter to Kephart, states that he, Williamson, and Kirkpatrick are agreeable to endorsing the note with one of the provisions to be that "[y]ou along with the three of us will personally guarantee such loan."

We find nothing in the correspondence between the parties or elsewhere in the record to suggest that the parties intended to forgive Kephart of liability as a co-maker.

The correspondence between Kephart and Pemberton indicates that both Kephart and Pemberton considered that Kephart was liable on the note.

The July 6, 1978 letter from Pemberton to Kephart stated, in part: "For your information, we have purchased at face value the note and intend to proceed against you unless the S–1 Registration is realistic" (The S–1 registration referred to Kephart's attempt to sell LaFollette.). Kephart, on July 31, 1978, answered Pemberton's letter, which answer is, in part, as follows: "It is my sole purpose to resolve LaFollette in such a way that the $250,000.00 note is paid, and that I wind up without that liability, and certainly where neither you nor your client has any liability."

Kephart argues that he is "not an attorney and could not have been expected, under the circumstances (the circumstances being Mr. Kephart's continued efforts over a long period of months to effect a sale of an interest in LaFollette Mining Company or its properties), to frame his responses to Mr. Pemberton's letters by a legal denial of liability."

The record shows that Mr. Kephart, prior to his letter of July 31, 1978, was a businessman of wide experience. He had been engaged in several venture capital enterprises and contract negotiations, primarily in coal but also in other types of ventures as a principal and developer. He, better than anyone, knew what his intentions were at the time he accepted the December 5, 1977 letter. It was not necessary to write a letter couched in legal terms to deny that he owed any amount to plaintiffs. He could simply have stated "I don't owe you and that was our intent when we entered into the December 5, 1977 agreement."

We take no issue with the rule of law cited by the Chancellor that where a contract provision is ambiguous, it should be construed as against its author. *Nashville Electric Supply Co. v. Kay Industries Inc.,* 533 S.W.2d 306 (Tenn.App.1975). However, the instrument or instruments as a whole along with the surrounding circumstances should be taken into consideration to determine the intention of the parties where

there is any doubt. "The nature of the contract and the conduct of the parties in the particular transaction will govern their relationship regardless of words which might indicate the contrary." *Robertson v. Lyons*, 553 S.W.2d 754, 757 (Tenn.App.1977).

This Court is of the opinion that a simple reading of the two letters which comprise the agreement between the parties, taken together with the conduct of the parties, clearly do not evidence any intention on the part of the parties to relieve Kephart of liability.

This Court is of the opinion that the judgment of the Chancellor should be reversed and a judgment should be entered against Capital in the principal sum of $250,000 with interest and attorneys' fees and against Kephart for his pro rata contribution. The cause is remanded to the Chancery Court for determination of the amount of interest and attorneys' fees and the collection of costs which are adjudged *against defendants and any further necessary proceedings.*

TODD, P. J., and CANTRELL, J., concur.